A98A2419. DAVENPORT v. NORTHEAST GEORGIA MEDICAL CENTER, INC.
(542 SE2d 525)

BARNES, Judge.

When Northeast Georgia Medical Center, Inc. revoked the medical staff privileges of James A. Davenport, M.D., the physician sued the hospital, seeking damages and injunctive relief. The trial court determined that Dr. Davenport presented no evidence for which

there was no adequate remedy at law and denied him injunctive relief. After discovery, the hospital moved for summary judgment, asserting that it was entitled to immunity from damages because it had revoked Dr. Davenport's privileges in accordance with the federal Health Care Quality Improvement Act (HCQIA), 42 USC § 11101 et seq. The trial court granted the hospital summary judgment, and Dr. Davenport appealed, contending that the hospital was not entitled to immunity because (1) he did not receive adequate notice of the reasons the hospital revoked his privileges; (2) there is a genuine issue as to whether the hospital complied with the statutory prerequisites for immunity; and (3) there is a question of fact as to whether his conduct adversely affected the health or welfare of patients.

In *Davenport v. Northeast Ga. Med. Center*, 237 Ga. App. 252, 256 (515 SE2d 162) (1999), we determined that a genuine issue of material fact remained as to whether the hospital gave Dr. Davenport adequate notice of the reasons for the proposed revocation of his staff privileges and reversed on that basis without reaching the issue of whether the summary judgment was correct. The Supreme Court granted certiorari to consider what constitutes "adequate notice" under 42 USC § 11112 (a) (3), concluded that the HCQIA neither requires that the notice set forth the reasons for the proposed action in a formal and precise manner nor mandates that the reasons be limited in number and scope or always be restated in the same terms, reversed our decision as to adequate notice, and remanded the case so that we may consider the remaining substantive issues. *Northeast Ga. Med. Center v. Davenport*, 272 Ga. 173, 174 (527 SE2d 548) (2000). The previous judgment of this Court is vacated, and the judgment of the Supreme Court is made the judgment of this Court. In accordance with the mandate of the Supreme Court, we now proceed to consider and decide the remaining enumerations of error.

On appeal of a grant of summary judgment, we determine whether the trial court erred in concluding that the moving party demonstrated that no genuine issue of material fact remained and that the party was entitled to judgment as a matter of law. OCGA § 9-11-56 (c). Specifically as to the HCQIA, we determine whether "a reasonable jury, viewing the facts in the best light for [Dr. Davenport], [might] conclude that he has shown, by a preponderance of the evidence, that the [hospital's] actions are outside the scope of § 11112 (a)." *Austin v. McNamara*, 979 F2d 728, 734 (9th Cir. 1992); *Bryan v. James E. Holmes Regional Med. Center*, 33 F3d 1318, 1332-1333 (3) (a) (11th Cir. 1994).

The record reveals that Dr. Davenport, who was board certified in internal medicine and obstetrics and gynecology (OB/GYN), was granted medical staff privileges at Northeast Georgia Medical Center

in Gainesville shortly after he arrived there in October 1990. Beginning in March 1992 and continuing through December 1994, a total of 22 complaints were submitted against the physician. In March 1993, the Peer Review Committee met to review three incidents. The first one concerned his use of prostaglandin gel in an in-house composition for cervical ripening after the Pharmacy & Therapeutics Committee (P&T Committee)[1] had instructed the OB/GYN Department against doing so based on information from legal counsel and a pharmaceutical representative. After reviewing medical literature and the experiences of their peers, the OB/GYN Department petitioned the P&T Committee to study and reconsider the matter. Although the P&T Committee later approved such usage of the gel based on the OB/GYN Department's recommendation, Dr. Davenport had used the gel composition before such approval.

The second incident concerned Dr. Davenport's traveling outside of the call area while on call. He was 43 minutes, rather than the usual 30 minutes, away from the hospital.

The third incident concerned Dr. Davenport's telling a nurse to "back-time" orders. In that incident, after twenty-three hours had passed since one of Dr. Davenport's Medicaid patients had been admitted, a nurse told him that they still had two things left to do with the patient. Dr. Davenport told the nurse to "backdate" the record and "get the two things that you have to do quickly." According to another physician,

> if a patient is admitted with an antepartum problem, if she's here under 23 hours, it's better — the Medicaid is more likely to reimburse the hospital. . . . [Dr. Davenport] basically just offered them a way out — I guess, himself a way out, too. But no great sin there. Nor trying to cheat anybody. Not taking money out of anybody's mouth. Not diverting anything to himself. Nothing to the disadvantage of the patient. Just a matter of internal bookkeeping.

Finally, Dr. Davenport ordered that the patient be admitted to another unit to complete the patient care.

After meeting with the Peer Review Committee regarding these three incidents, Dr. Davenport agreed to future compliance with rules and policies. Dr. Rigel of the Anesthesia Department decided to "informally monitor" his progress and instructed the nursing staff to watch him carefully and to report any activity that they found to be

---

[1] The P&T Committee is involved in determining which medications, requested by physicians, are brought into the formulary and for what indications the medications may be used.

inappropriate.

Thereafter, complaints concerning Dr. Davenport's call coverage and interaction with nursing personnel resulted in another Peer Review Committee meeting on September 15, 1993. The committee found that Dr. Davenport continued to exhibit inappropriate behavior and placed him on probation for one year, recommending that his privileges be suspended for any future validated recurrences of problems.

In October 1994, the Peer Review Committee reviewed additional incidents that had occurred since the previous meeting. Some of the incidents related to call coverage. For example, at one point, Dr. Davenport wanted to be called when his patients went into the labor room, even when he was not on call. That "unusual" call schedule created problems. According to one nurse, generally, when a physician goes out of town, he is not available to assess his patients and arranges for another physician to manage his patients. Because Dr. Davenport wanted to be called for certain matters and for someone else to be called for other matters, the nursing staff was left to determine whom to call when. After meeting, the Peer Review Committee issued its report to the Executive Committee, which extended his probation period for three months and further instructed Dr. Davenport, "When you are not on call, the hospital operator will direct *all* calls to your practice to the covering physician. Neither the operator nor the Labor and Delivery staff should be instructed to triage your calls for referral to you or to the covering physician." (Emphasis in original.) But in December, one of the hospital's physicians, with whom Dr. Davenport had arranged call coverage, reported that Dr. Davenport had violated the terms of his probation by giving his beeper number to his patients while the other physician was on call for Dr. Davenport. Finally, on January 13, 1995, the Chief of Anesthesia filed a complaint that Dr. Davenport allowed one of his patients to chew on some ice chips after an NPO[2] order had been issued. The incident had taken place in December 1994, when Dr. Davenport was still on probation. Dr. Davenport had called for one of his labor patients to be administered an epidural by the anesthesiologist, Dr. Rigel, who was on call that night. Later, the patient complained that her mouth was dry, and Dr. Davenport told the attending nurse that the patient could have some liquids. When the nurse refused to give the patient anything, stating that "people who have epidurals are not allowed to have anything to eat or drink," Dr. Davenport left the room to get the patient orange juice. He returned and gave his patient, who then had been in labor for twelve hours, one

---

[2] NPO means "non per os," nothing by mouth.

teaspoon of ice chips from the top of a frozen container of orange juice. The nurse reported the incident to Dr. Rigel.

Dr. Rigel reported the incident to the Chief of Anesthesia, the Peer Review Committee, and the Anesthesia Department, pointing to an unwritten hospital policy that patients are NPO after the administration of epidural analgesia. According to Dr. Rigel, because the obstetric patient is at high risk for aspiration and regurgitation, intragastric contents should be kept as low as possible. Dr. Rigel was told by Dr. Davenport that he gave his patient "just a sip," and in Dr. Rigel's opinion, "that's inappropriate" and "endangered her."

Dr. Rigel admitted that the hospital's policy had not been reviewed since it was put in place in 1984. He also stated that other hospitals do allow labor patients with epidurals to have ice chips or liquids. One board-certified physician, who was chief of the OB/GYN services at an Atlanta hospital, testified that it was "common practice" to allow ice chips, tap water, clear liquids, and hard candy to make the labor more comfortable and that grape juice and orange juice are also allowed, depending on the doctor.

Because of that incident and as requested by the Anesthesia Department, the hospital's Chief of Staff terminated routine elective epidural analgesia for Dr. Davenport's patients pending a review of the matter. According to Dr. Rigel,

> What we wanted to do was be protected from the actions of Dr. Davenport while we were responsible for his patients. . . . We're worried about what might he do next that will involve us. . . . We were worried that not having followed that protocol, what next would he do that might endanger the patients.

When the summary suspension of Dr. Davenport's privileges was submitted to the Executive Committee, it upheld the suspension, questioned whether the incident violated his existing probation, directed the Peer Review Committee to "analyze the . . . situation, taking into account all previous incidents," and voted to extend Dr. Davenport's probation. The Peer Review Committee determined that Dr. Davenport had violated his probation, reporting its conclusion back to the Executive Committee, which voted to suspend Dr. Davenport's medical staff privileges at the hospital.

In June 1995 and November 1995, evidentiary hearings were held before the Judicial Review Committee, which found

> significant problems with Dr. Davenport's ability to function within the structure and rules of the hospital. He appears to lack the ability to learn from previous experiences and he

has poor skills for interpersonal conflict resolution. He has also, at times, exhibited poor judgement regarding call, especially in that he has requested that hospital personnel make unreasonable clinical decisions.

Recommending probation, the Judicial Review Committee forwarded its findings to the Executive Committee, which rejected the recommendation and voted to reaffirm its prior decision suspending Dr. Davenport. Dr. Davenport then requested an appellate review by the full board of directors, which after a hearing, unanimously voted on March 11, 1996, to revoke his privileges. The board stated its concern

with Dr. Davenport's continued inability to function within the structure of the hospital, failure to function within the structure of the hospital, failure to learn from previous experiences, continued problems with resolving interpersonal conflicts, and unprofessional conduct. This Board finds that maintaining and furthering the quality of care at Northeast Georgia Medical Center necessitates that Medical Staff members possess an ability to work with and relate to others in a cooperative and professional manner, and that because of Dr. Davenport's inability to do so, revocation of his privileges is in the best interest of the overall quality of care at Northeast Georgia Medical Center.

The revocation of Dr. Davenport's medical staff privileges is the subject of this lawsuit and appeal.

1. Dr. Davenport contends that the trial court erred when it determined that the hospital was immune from damages under HCQIA because there was a genuine issue of material fact as to whether the hospital met the professional review requirements, other than notice. For purposes of the protection set forth in 42 USC § 11111 (a), a professional review action must be taken:

(1) in the reasonable belief that the action was in furtherance of quality health care; (2) after a reasonable effort to obtain the facts of the matter; (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances; and (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

42 USC § 11112 (a) (1)-(4).

A professional review action shall be presumed to have met the

preceding standards, 42 USC § 11112, but if a plaintiff challenging a peer review action proves, by a preponderance of the evidence, any one of the four requirements was not satisfied, the peer review body is no longer afforded immunity from damages under the HCQIA. *Islami v. Covenant Med. Center*, 822 FSupp. 1361, 1377-1378 (N.D. Iowa 1992).

(a) First, Dr. Davenport argues that the hospital's professional review action was not taken in the reasonable belief that it was in furtherance of quality health care. He urges that he acted within the standard of care, that neither the evidence nor the Judicial Review Committee findings show that he acted in a way that could have endangered a patient, and that none of the complaints involved a patient being harmed. He points out that Dr. Smith, Chief of Staff at the time of the Judicial Review Committee review in June 1995, stated that "no one alleges that Dr. Davenport . . . has performed a malpractice or a failure to provide necessary services to peers and the medical staff," and that Dr. Stewart, Chairman of the Judicial Review Committee, concluded that the evidence involved "issues" which "were not primarily medical in terms of specific patient care issues."

"[T]he Act does not require that the professional review result in an actual improvement of the quality of health care." *Imperial v. Suburban Hosp. Assn.*, 37 F3d 1026, 1030 (4th Cir. 1994). Our focus is on the reasonableness of the peer reviewers' belief that they were furthering quality health care. Id. Here, over 20 complaints were submitted regarding Dr. Davenport's call coverage, compliance with the hospital's rules and policies, and interaction with nursing personnel. Our review of the record makes clear that the hospital's decision to terminate Dr. Davenport's medical staff privileges was taken "in a reasonable belief that the action was in furtherance of quality health care." 42 USC § 11112 (a) (1).

(b) Second, Dr. Davenport claims that the action was not taken after a reasonable effort to obtain the facts of the matter. He asserts that many of the complaints were improperly ascertained, insufficiently verified by the proceedings, or were otherwise refuted. But the determinative inquiry on this issue is whether or not the totality of the process leading up to the board's decision evidenced a reasonable effort to obtain the facts of the matter. *Mathews v. Lancaster Gen. Hosp.*, 87 F3d 624, 637 (3rd Cir. 1996). In this case, the record shows that the hospital's Peer Review Committee investigated the complaints. Dr. Davenport also met with the Peer Review Committee on numerous occasions regarding the complaints. Further, when the Executive Committee decided to revoke Dr. Davenport's medical staff privileges, evidentiary hearings before the Judicial Review Committee were scheduled. Dr. Davenport was present and represented by

counsel. He and the hospital presented evidence. Further, Dr. Davenport agreed to the submission of his peer review file, along with the medical records pertaining to the cases referenced in the peer review file, for the Judicial Review Committee's consideration. Dr. Davenport requested and received appellate review of the revocation, as a result of which the hospital's board also voted to revoke his privileges. We find that Dr. Davenport has failed to demonstrate that the totality of the process leading up to the board's decision was not a reasonable effort to obtain the facts of the matter.

(c) Third, Dr. Davenport claims that the revocation of his privileges was not taken in the reasonable belief that it was warranted by the facts known. The HCQIA grants broad discretion to hospitals with regard to staff privileges decisions, and our role "on review of such actions is not to substitute our judgment for that of the hospital's governing board or to reweigh the evidence regarding the renewal or termination of medical staff privileges." (Citation and punctuation omitted.) *Bryan*, supra, 33 F3d at 1337. Here, Dr. Davenport has failed to show sufficient evidence to rebut the presumption that the hospital's action was taken in the reasonable belief that it was warranted by the facts known, after reasonable efforts to obtain facts.

Dr. Davenport has failed to demonstrate that a reasonable factfinder could find by a preponderance of the evidence that the hospital had not met the above requirements.

2. Dr. Davenport contends that he has raised material issues of fact as to whether the hospital was motivated by something other than a reasonable belief that its actions would further the care of its patients. Like other jurisdictions, we adopt an objective standard of reasonableness in this context. See, e.g., *Imperial v. Suburban Hosp. Assn.*, supra, 37 F3d at 1030; *Bryan*, supra, 33 F3d at 1335; *Smith v. Ricks*, 31 F3d 1478, 1485 (9th Cir. 1994). Therefore, the good or bad faith of the reviewers is irrelevant. "The real issue is the sufficiency of the basis for the hospital's actions." (Citation and punctuation omitted.) *Bryan*, supra, 33 F3d at 1335. The "reasonable belief" standard articulated in 42 USC § 11112 (a) (1) will be satisfied "if the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their actions would restrict incompetent behavior or would protect patients." (Citation and punctuation omitted.) *Mathews*, supra, 87 F3d at 635. In Division 1, supra, we concluded this issue adversely to Dr. Davenport.

*Judgment affirmed. Johnson, C. J., and Ruffin, J., concur. Smith, P. J., recused.*

DECIDED NOVEMBER 14, 2000 —
RECONSIDERATION DISMISSED DECEMBER 8, 2000.

*John M. Brown*, for appellant.
*Whelchel & Dunlap, Thomas M. Cole*, for appellee.