**FIRST DIVISION**
**BARNES, P. J.,**
**MCMILLIAN and MERCIER, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**June 29, 2017**

# In the Court of Appeals of Georgia

A17A0114. KOLB v. NORTHSIDE HOSPITAL.

MCMILLIAN, Judge.

Susan Kolb, M.D., appeals the trial court's grant of summary judgment to Northside Hospital ("Northside") on her claims for breach of contract, negligence, tortious interference with business and contractual relations, and attorney fees arising out of the suspension of her medical staff privileges at the hospital. At issue in this appeal is whether the federal Health Care Quality Improvement Act of 1986 (the "HCQIA"), 42 USC § 11101 et seq., bars Dr. Kolb's recovery of money damages against Northside. Because we find that HCQIA immunity applies as a matter of law, we affirm the trial court's grant of summary judgment in favor of Northside.

"Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). We review a grant or denial of summary judgment de novo and construe the evidence in the light most favorable to the nonmovant." (Citation omitted.) *Elder v. Hayes*, 337 Ga. App. 826, 827 (788 SE2d 915) (2016).

So viewed, the evidence shows that Dr. Kolb is a plastic surgeon licensed to practice in the State of Georgia. She became a member of the medical staff at Northside on January 1, 1992. In late October 2007, Dr. Wayne L. Ambroze, who was vice chairman of the Medical Executive Committee (the "MEC") and vice chief of staff at Northside, notified Dr. Kolb in a telephone call that her privileges to practice at the hospital were being summarily suspended. Dr. Ambroze, along with Dr. Diane Wisebram, the chairman of the MEC, made the decision to suspend Dr. Kolb's privileges after receiving reports from various Northside staff members about Dr. Kolb.

On November 1, 2007, Drs. Wisebram and Ambroze sent Dr. Kolb a letter formally notifying her of her suspension and asserting that it was based on a "reasonable suspicion of impairment," arising from reports of statements that Dr. Kolb had made (the "Suspension Letter"). The letter stated that before Dr. Kolb's

2

privileges could be reinstated, Northside required that she submit to a medical and psychiatric evaluation, with the results furnished to the hospital, and further informed her that under the hospital's "Medical Staff By-laws" (the "Bylaws"), she was entitled to a fair hearing on her suspension.

Dr. Kolb opted for a fair hearing, in lieu of the medical and psychiatric evaluations, and it was scheduled for January 7, 2008. An outside attorney was engaged to serve as the hearing officer, and four physicians not previously involved in the decision to suspend Dr. Kolb were appointed as members of the Fair Hearing Committee (FHC). At Dr. Kolb's request, the committee members were subjected to a number of voir dire questions submitted by her counsel, and she raised no objection to their service. Both Dr. Kolb and the MEC were represented by counsel at the hearing, which spanned two evenings and included over eight hours of evidence and argument on January 7 and February 5, 2008.

The FHC issued a written report in late February 2008 concluding that the MEC "presented sufficient evidence to convince the Fair Hearing Committee, by a preponderance of the evidence, that its action in imposing a summary suspension of Dr. Kolb's privileges was based in fact and was not arbitrary, unreasonable, or capricious." The FHC also found that "it could not, in good faith, make any

3

recommendation that Dr. Kolb be allowed to continue to practice at Northside Hospital without an appropriate evaluation and intervention." Nevertheless, the FHC stated that "with a thorough long-term independent evaluation and compliance with any recommended treatment and monitoring, [it] felt there might be a limited opportunity for Dr. Kolb to demonstrate her ability to practice at Northside Hospital in the future" and listed recommended steps for her to follow to seek reinstatement.

Dr. Kolb appealed the FHC's decision to an Appellate Review Committee, comprised of three members of Northside's Board of Directors (the "Appellate Committee"). At Dr. Kolb's request, no oral argument was held before that committee. In its written decision in May 2008, the Appellate Committee unanimously found that the FHC's decision regarding the suspension of Dr. Kolb "was justified and was not arbitrary, unreasonable or capricious." However, the Appellate Committee recommended certain modifications to the FHC's recommended steps for Dr. Kolb to follow before seeking reinstatement of her privileges at Northside. Nothing in the record shows that Dr. Kolb followed the recommendations of either the Hearing or the Appellate Committees.[1]

---

[1] Additional facts will be recited as necessary to address Dr. Kolb's arguments.

Over four years later, Dr. Kolb initiated this action, and she now appeals the trial court's grant of summary judgment on her claims, arguing that the trial court applied an incorrect standard of review by failing to view the facts in the light most favorable to her and instead giving undue deference to the hospital's decision, thus depriving her of a meaningful review of the record. She also argues that under the proper standard of review, a jury could find that Northside was not entitled to immunity from damages under the HCQIA.

1. As an initial matter, we note that "HCQIA immunity is a question of law for the court to decide and may be resolved whenever the record in a particular case becomes sufficiently developed." (Citation and punctuation omitted.) *Taylor v. Kennestone Hosp., Inc.*, 266 Ga. App. 14, 14 (596 SE2d 179) (2004). See also *Bryan v. James E. Holmes Regional Med. Center*, 33 F3d 1318, 1332 (III) (A) (11th Cir. 1994). Here, the parties agree that the HCQIA governs the peer review decision resulting in Dr. Kolb's suspension, although they dispute whether Northside complied with the statute in conducting that review. See 42 USC § 11151 (9) (defining "professional review action"). The HCQIA provides immunity from monetary damages for professional review actions taken

(1) in the reasonable belief that the action was in furtherance of quality health care,

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirements of paragraph (3).

42 USC § 11112 (a). See also 42 USC § 11111 (a) (1) (providing that professional review actions meeting the requirements of § 11112 (a) insulate, inter alia, the professional review body, its members, and staff from liability for money damages under federal or state law for claims arising out of their actions, with certain limited exceptions not applicable here).[2]

---

[2] We note that Georgia also has an immunity provision, which is not at issue in this appeal. Under that provision,

No professional health care provider nor any individual who serves as a member or employee of a professional health care provider or review organization nor any individual who furnishes counsel or services to a professional health care provider or review organization shall be held,

Under 42 USC § 11112 (a), professional review actions are presumed to have met these statutory requirements, and the burden is on the opposing party to rebut that presumption by a preponderance of the evidence. Therefore, "the presumption language in [the] HCQIA means that the *plaintiff* bears the burden of proving that the peer review process was *not* reasonable." (Emphasis in original.) *Bryan*, 33 F3d at 1333 (III) (A).[3]

2. Dr. Kolb first argues that the trial court erred in giving great deference to Northside's decision to suspend her privileges instead of construing the evidence in her favor on summary judgment.

---

by reason of the performance of peer review activities, to have violated any criminal law or to be civilly liable under any law unless he was motivated by malice toward any person affected by such activity.

OCGA § 31-7-132 (a).

[3] As one court has explained, the statutory presumption relieves defendant peer review participants of their initial burden on summary judgment of providing evidentiary support for their contention that they are entitled to immunity, and the plaintiff's "burden is no different than that of the nonmovant who must demonstrate the existence of a genuine issue as to any material fact on all of the elements of the claim alleged once a movant for summary judgment files a properly supported motion." (Citations omitted.) *Singh v. Blue Cross/Blue Shield of Mass., Inc.*, 308 F3d 25, 32-33 (1st Cir. 2002).

This Court has held that in reviewing the issue of immunity under the HCQIA on summary judgment, a "trial court is required to determine, *viewing the facts in the light most favorable to the plaintiff*, whether a reasonable jury could conclude that the plaintiff has shown by a preponderance of the evidence that the peer review activities did not meet the standards set forth in the Act." (Citation and punctuation omitted; emphasis in original.) *Patton v. St. Francis Hosp.*, 260 Ga. App. 202, 205 (1) (b) (581 SE2d 551) (2003). See also *Davenport v. Northeast Ga. Med. Center*, 247 Ga. App. 179, 180 (542 SE2d 525) (2000). See also *Bryan*, 333 F3d at 1333-34 (III) (A). However, this Court also has held that the HCQIA "grants broad discretion to hospitals with regard to staff privilege decisions, and our role on review of such actions is not to substitute our judgment for that of the hospital's governing board or to reweigh the evidence regarding the termination of medical staff privileges." (Citation and punctuation omitted.) *Patton*, 260 Ga. App. at 207-08 (1) (c) (iv). See also *Univ. Health Svcs., Inc. v. Long*, 274 Ga. 829, 829 (561 SE2d 77) (2002). This Court, on occasion, has expressed this standard as giving "deference" to a hospital's

8

review decision.[4] See *Burrowes v. Northside Hosp.*, 294 Ga. App. 472, 476 (2) (671 SE2d 176) (2008).

Here, the trial court found that no genuine issues of material fact existed and recited the standards that "its role was not to substitute it judgment regarding a physician's competency for the medical judgment of the hospital" and that it was required to give "great deference to the hospital's medical decision and that of the governing body of the hospital." Although the trial court did not expressly recite the requirement that the evidence must be construed in the light most favorable to Dr. Kolb, we find no indication that the trial court failed to do so. See *Patton*, 260 Ga. App. at 205 (1) (b). But pretermitting whether the trial court properly construed the evidence, our review of the trial court's order on appeal is de novo, and we apply the standard set forth in *Patton* in our review of the evidence.

---

[4] Although Dr. Kolb argues that such deference should apply only in situations where a physician's privileges are suspended based on his professional competency, we find no legal basis for such a limitation. See, e.g., *Davenport*, 247 Ga. App. at 186 (1) (a) (refusing to substitute court's opinion for that of hospital governing board or to reweigh the evidence where hospital revocation of staff privileges was based on issues that "were not primarily medical in terms of specific patient care issues"); see also *Robbins v. Ong*, 452 FSupp. 110, 115 (S.D. Ga. 1978) (applying deference where doctor's competence was not at issue, but instead the failure to renew his hospital privileges was based on "turmoil and disruption" he brought to the hospital).

9

3. Dr. Kolb also contends that the trial court erred in granting summary judgment to Northside because, viewing the evidence in the proper light, a reasonable jury could conclude by a preponderance of the evidence that Northside failed to comply with the HCQIA by (1) admitting that Dr. Kolb's care of her patients was not at issue; (2) failing to follow its own Bylaws; (3) suspending Dr. Kolb without conducting an investigation; and (4) improperly focusing on her religion.

(a) The first requirement for immunity under the HCQIA is that Northside's action be taken in the reasonable belief that it "was in furtherance of quality health care." 42 USC § 11112 (a) (1). Dr. Kolb contends that Northside did not meet this requirement because her suspension was not based on issues involving her patient care.

"A professional review action is taken in the reasonable belief that it is in furtherance of quality health care if on the evidence then before them, the reviewers would reasonably have concluded that their action would restrict incompetent behavior or would protect patients." (Citation and punctuation omitted.) *Patton*, 260 Ga. App. at 206 (1) (c) (i). "The Act does not require that the professional review result in an actual improvement of the quality of health care. Our focus is on the reasonableness of the peer reviewers' belief that they were furthering the quality of

health care." (Citations and punctuation omitted.) *Patrick v. Floyd Med. Center*, 255 Ga. App. 435, 440 (3) (a) (i) (565 SE2d 491) (2002).

(i) In summarily suspending Dr. Kolb's medical privileges, Northside cited a reasonable suspicion of impairment based on reports that she had made statements indicating that she carried a gun because there was a bounty on her head; the DeKalb County police had recommended that she carry a weapon after multiple assassination attempts against her; the government may be after her because she had removed a microchip implanted in a patient in the federal witness protection program; she is the reincarnation of Lizzie Borden; the military wanted to hire her "to conduct 'remote viewing'[5] through out-of-body experiences;" and she uses her psychic powers to help people find things.

At the fair hearing, Dr. Wisebram, the MEC chairman, testified about a conversation she had with Dr. Kolb shortly before the suspension on an unrelated matter. She said that during that conversation, Dr. Kolb volunteered that she carried

---

[5] Dr. Kolb explained at the hearing that remote viewing "is where you go into a darkened room" and after being given coordinates, "you go into a state of meditation and go there and then you describe what you see and you actually draw a picture of it." She stated that this procedure is used by the military, the United Nations, the FBI, and the CIA "[t]o determine where things are and where people are and what's going on."

a gun because there had been three assassination attempts on her life. The MEC also presented testimony from other hospital personnel regarding interactions they had with Dr. Kolb, which they had reported to various authorities at Northside. These reports included testimony that Dr. Kolb had stated that a manufacturer of silicone was trying to kill her and the FBI might be after her; she carries a gun because there is a bounty on her head (and in October 2007, she appeared to have her gun in the area outside the operating room); the military wanted to hire her to do remote viewing; the government may be after her because she removed a microchip from a federal witness; and a silicone manufacturer and/or the government was out to get her and had possibly hired a hit man. Karen Parham, the operations coordinator at a Northside facility, testified that in October 2007, some of her staff reported that they were nervous about working with Dr. Kolb because she "kind of frightened them a little bit" when she made such statements. Parham obtained written reports from these individuals and forwarded them to Northside's risk management department. Another witness testified that Dr. Kolb's statement about her gun made her very concerned about her own safety.

Dr. Ambroze testified that the main concern behind Dr. Kolb's suspension was the issue of the gun, explaining,

"[M]y responsibility as part of medical staff leadership is to protect staff and patients. And to me, if . . . you're delusional and you have a gun on campus, we've got a problem. And, on the other hand, if there are assassins after you and you're aware of this and you feel you need a gun to protect yourself, then our staff and patients are still in danger of being caught in the crossfire. . . . So either way, I just could not see . . . avoiding the suspension.

Dr. Wisebram confirmed that the main concern behind the suspension involved Dr. Kolb's possession of the gun and the statements from the staff. She explained,

We were concerned about if, indeed, she did have assassination attempts against her life, somebody is going to come in this hospital and shoot her. And we're going to have a shoot-out in front of our hospital while somebody is trying to assassinate her and, you know, assuming that the assassination attempts could be real, is somebody going to come in this hospital and open fire on her, take out some of your nurses and our patients.

Although Dr. Kolb denied making some of the statements and presented evidence to explain other statements and her reasons for carrying the gun, she testified that she had reason to believe that there had been several attempts on her life,

and although she did not report them to police, she admitted that she told Dr. Wisebram about them.

We find that this and other evidence presented by Dr. Kolb, including testimony from a psychiatrist she hired to perform an evaluation for the hearing, were insufficient to overcome the presumption that the MEC acted in the reasonable belief that her suspension was in furtherance of quality health care. See *Davenport*, 247 Ga. App. at 185 (1) (a) (revocation of medical staff privileges made in the reasonable belief that it was in furtherance of quality health care, where numerous complaints were submitted regarding the doctor's call coverage, compliance with hospital rules and policies, and interaction with nursing personnel).

(ii) Dr. Kolb further asserts that Northside improperly focused on her religious and spiritual beliefs instead of patient care in suspending her privileges. In support of this argument, she cites the testimony of three MEC witnesses, who testified that Dr. Kolb sometimes read the auras of patients and staff, she believed in clairvoyance and psychic powers, and she sometimes practiced Reiki with her patients. One of these witnesses said that a gesture Dr. Kolb performed with her hand over a patient was "eerie" and a fourth witness said that her comments about remote viewing made the witness feel uncomfortable. Although a number of witnesses cited Dr. Kolb's

14

spiritual practices, the record demonstrated that such matters were not the primary basis for her suspension. As Dr. Wisebram stated, "We weren't as concerned about healing powers or psychic powers. We were concerned about a gun." The Suspension Letter itself made this point, stating that

> Medical Staff leadership has determined that the statements noted above, in particular the repeated statements about multiple assassination attempts and statements that you are carrying a handgun, constitute such a direct and immediate threat, which requires that action be taken immediately to protect the life, health and/or welfare of Northside's patients and staff . . . .

Dr. Kolb has introduced no competent evidence that any bias against her religious and spiritual beliefs was a deciding factor in the review process. "In any event claims of bias are irrelevant to the reasonableness standards of 42 USC § 11112 (a) of the Act," because Georgia "has adopted an objective standard of reasonableness in this context." (Citation and punctuation omitted.) *Patrick*, 255 Ga. App. at 440 (3) (a) (i).

Therefore, even construing the evidence in Dr. Kolb's favor, we find that Dr. Kolb failed to demonstrate that a reasonable jury could conclude that she has shown

15

by a preponderance of the evidence the MEC's decision to suspend her was not based on a reasonable belief that it was furthering the quality of health care at the hospital.

(b) Dr. Kolb additionally argues that Northside failed to follow the procedures outlined in its Bylaws for interventions for impaired providers, and thus, the MEC's decision was per se unreasonable.

The Suspension Letter stated that the Northside impaired provider committee had determined

> there are sufficient specific, contemporaneous physical, behavioral or performance indicators consistent with substance abuse or other psychiatric or medical conditions to support the reasonable suspicion of impairment which may affect your clinical judgment or may otherwise constitute a direct and immediate threat to the health, welfare and safety of patients or others in the hospital.

Citing § 8.4 of the Bylaws governing summary suspensions , the Suspension Letter states that "a [p]ractitioner who is suffering an impairment may be summarily suspended . . . based on conduct which constitutes a direct and immediate threat to the physical or mental health, welfare, and safety of patients, other Practitioners, or Hospital personnel." And as quoted above, the letter stated that the MEC had

16

determined that Dr. Kolb's statements regarding assassination attempts and her gun constituted such a direct and immediate threat.

Although Dr. Kolb argues that Northside failed to abide by the procedures outlined in the Impaired Provider Policy under § 8.5 of the Bylaws, Northside asserts that those procedures were not applicable to her summary suspension under § 8.4. However, pretermitting whether Northside violated its own Bylaws, "[t]he HCQIA does not require that hearing procedures satisfy a hospital's bylaws in order for immunity to apply." *Taylor*, 266 Ga. App. at 20 (2). See also *Meyers v. Logan Mem. Hosp.*, 82 FSupp2d 707, 715 (W.D. Ky. 2000) ("[T]here is no statutory requirement set forth in the HCQIA that a peer review proceeding must be conducted in accordance with a hospital's own specific internal bylaws or procedures.") (citations and punctuation omitted). In fact, "HCQIA immunity extends to claims arising out of alleged bylaws violations that occur in the course of peer review." *Taylor*, 266 Ga. App. at 21 (3). See *Patton*, 260 Ga. App. at 202. Accordingly, this ground provides no basis for reversal.

(c) Dr. Kolb further contends that Northside is not entitled to HCQIA immunity because it suspended her without conducting any investigation. One factor required to qualify for immunity is that the peer review action be taken "after a reasonable

17

effort to obtain the facts of the matter." 42 USC § 11112 (a) (2). "[T]he determinative inquiry on this issue is whether or not the totality of the process leading up to the board's decision evidenced a reasonable effort to obtain the facts of the matter." *Patton*, 260 Ga. App. at 207 (1) (c) (ii). See *Davenport*, 247 Ga. App. at 185 (1) (b).

Here, the evidence showed that Northside's leadership became concerned about reports from various staff members concerning Dr. Kolb's statements regarding threats to her life that had resulted in her carrying a gun. Dr. Kolb herself voluntarily repeated some of these statements in a conversation with Dr. Wisebram before the summary suspension. Although following the suspension, the MEC collected witness statements addressing the issues involving Dr. Kolb, the committee's postsuspension efforts to continue documenting the staff's complaints does not make its presuspension efforts unreasonable, particularly in this case, since Dr. Kolb herself admitted the primary allegations before the suspension. We find, therefore, that Dr. Kolb failed to point to evidence in the record sufficient to permit a jury to find that she has overcome, by a preponderance of the evidence, the presumption that the hospital summarily suspended her clinical privileges only "after a reasonable effort to obtain the facts of the matter." 42 USC § 11112 (a) (2). See *Patton*, 260 Ga. App. at 207 (1) (c) (ii); *Davenport*, 247 Ga. App. at 185 (1) (b).

Accordingly, we affirm the trial court's grant of summary judgment.

*Judgment affirmed. Barnes, P. J., and Mercier, J., concur*.